IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SPORT OF BUSINESS, LLC, | ) |
|     Plaintiff/Counter-Defendant, | ) |
| v. | )   Civil Action No. 7:21-cv-00142 |
| SARAH BETH YOGA, LLC, | )   By: Elizabeth K. Dillon |
|     Defendant/Counterclaimant, | )        United States District Judge |
| v. | ) |
| AUTHORITY ONLINE, LLC, and ADAM LINKENAUGER, | ) |
|     Counter-Defendants. | ) |

**MEMORANDUM OPINION**

This matter is before the court on a motion to dismiss filed by plaintiff/counter-defendant Sport of Business, LLC, and counter-defendants Authority Online, LLC (Authority), and Adam Linkenauger. The counter-defendants move to dismiss counts I, II, IV, and V of the amended counterclaim filed by defendant/counterclaimant Sarah Beth Yoga, LLC (SBY). (Dkt. No. 31.) The parties did not request a hearing and informed the court that they wanted the motion to be resolved based on the written submissions.

For the reasons stated below, the counter-defendants' motion will be denied.

I. BACKGROUND[1]

The claims in this case arise out of a Business Sales Commission Agreement between Authority and SBY. (Agreement, Dkt. Nos. 1-1, 30-1.) The parties operated under the

---

[1] The following facts are taken from SBY's amended counterclaim and are accepted as true for purposes of this motion. (Am. Counterclaim, Dkt. No. 30.)

Agreement from July 4, 2018, through February 14, 2020. Authority assigned the Agreement to Sport of Business in early 2020. Linkenauger is the sole member of Sport of Business and was a member of Authority before that company dissolved in the spring of 2020.

SBY, a modern-day yoga and lifestyle company, offers a range of yoga videos on its YouTube channel, including yoga for beginners, prenatal yoga, power yoga workouts, and more. In October 2017, SBY communicated with Rakmoth Ullah regarding consulting services after meeting at VidSummit, a virtual event for creators, marketers, and brands. Ullah put SBY in touch with Linkenauger to discuss services provided by Authority Online, a company owned by Linkenauger, Ullah, and Micah Fraim.

Authority Online specializes in increasing online video views and repurposing YouTube videos for other social media platforms. During initial conversations with SBY, in October and November 2017, Linkenauger made the following written representations regarding the scope of Authority's services and the success of its marketing strategies:

- "We concentrate and work directly with you on every aspect of your YouTube channel, including planning your entire year of content, video types and lengths, content creation, intros/outros . . . The works . . . ."

- "We get over 1 billion views a year on Facebook, but only CREATE content solely for YouTube."

- "Our virtual live training includes a complete proprietary training we've developed with step by step set up and organization (lifetime access)."

- "We even cover how we get over 1 billion views and 100s of thousands of free leads through platforms OTHER tha[n] YouTube (by using the SAME content!)."

(Am. Counterclaim ¶ 16.)

In November 2017, Linkenauger offered SBY a "Black Friday Deal," whereby SBY could pay a flat rate fee of $5,000.00 for six months of access to a "Get More Views" course and access to one of Authority's Slack channels. Linkenauger explained, "People enjoy [S]lack

because you have access to me, [Rocky Ullah], our videographer and editor, content team, etc. So plenty of experts to answer questions." (*Id.* ¶ 17.) SBY paid the plat fee and continued discussions with Authority to determine whether SBY would contract with Authority once the initial six months expired. (*Id.* ¶ 18.)

In March and May 2018, Linkenauger made additional representations to SBY regarding the services that Authority provided, including:

- Editing and uploading videos to YouTube;
- Editing all content for Facebook, Instagram, and product pages;
- Providing wrapped-text videos for Facebook;
- Holding weekly meetings to "discuss direction as a team";
- Providing SBY with access to a team consisting of a content writer, content editors, designers, copywriters, a "web guy," and an "ads guy"; and
- Handling all YouTube videos, sales videos, content for product, and click funnels pages.

(*Id.* ¶¶ 19–21.) Linkenauger also stated that Authority's goal was "to remove the 'busy work'" to allow SBY to concentrate on creating content. (*Id.*) Relying on Linkenauger's statements regarding the comprehensive scope of Authority's services and the success of its marketing strategy, SBY executed the Business Sales Commission Agreement with Authority on July 4, 2018.

The Agreement contemplates that SBY (the Grantee) will make use of "Services Provided by Grantor [Authority Online] for a specific period by paying a percentage of Grantee's profits as Sales Commission to Grantor for the permission to use services provided by Grantor." (Agreement at 1.) The Agreement defines "Services Provided by Grantor" as "providing technical knowledge and expertise to clients in areas of Web development, marketing and

advertising, including all subsequent additions or improvements." (*Id.* § 1.10.) Section 1.10 also states that "Services Provided by Grantor" includes video editing services "at the request and discretion of the Grantee." (*Id.*) "If at any time the Grantee deems there are more efficient means to obtain video editing, the Grantor will not be required to perform this service." (*Id.*) SBY understood that this sweeping description of "Services Provided by Grantor" encompassed the services described by Linkenauger to SBY before the parties entered the Agreement. (Am. Counterclaim ¶ 27.)

      Also under the Agreement, Authority granted SBY a license to use Authority's technical knowledge and expertise in the areas of web development, marketing, and advertising for SBY's commercial endeavors. In exchange for the license, SBY agreed to pay Authority 20% of any gross profits that SBY obtained from "all commercial endeavors directly or indirectly involving the Services provided by" Authority. (Agreement §§ 1.8, 2.1, 2.3.) If Authority did not provide technical knowledge and expertise that SBY utilized in a commercial endeavor, or if SBY did not obtain any gross profits by using that technical knowledge or experience, then SBY owed nothing. (*Id.* § 2.4.) The Agreement had a ten-year term, but SBY could terminate the Agreement for convenience at any time. If it did so, SBY agreed to make a Buy Out Payment to Authority under a formula set forth in the Agreement. (*Id.* § 3.3.) Authority could assign the Agreement without SBY's consent. (*Id.* § 9.)

      SBY alleges that it never received the full scope of services set forth in the Agreement and described by Linkenauger. (Am. Counterclaim ¶¶ 30–44.) Between July 2018 and February 2019, SBY made repeated requests for video editing services. Authority's video editor provided only one sample on a single occasion. When SBY sent comments and feedback, the video editor went radio silent, and SBY never received any completed video content to post on social media.

Authority also failed to provide the step-by-step repurposing strategy touted by Linkenauger as garnering Authority's videos with over 1 billion views. Nor did Authority consistently hold weekly meetings, provide access to a full team of content, marketing and editing, and design personnel, provide wrapped-text videos for Facebook, or manage SBY's social media and sales videos. (*Id.*)

Frustrated with Authority's performance shortcomings, SBY requested that Authority amend the monthly sales commission payments from 20 percent to 10 percent of SBY's gross profits. After the amendment took effect in May 2019, Linkenauger cut off SBY's contact with the rest of the Authority team, including Ullah, and Linkenauger only sporadically communicated with SBY. Linkenauger also missed Zoom calls and speaking engagements. Accordingly, SBY sought to terminate the Agreement on January 15, 2020. (Am. Counterclaim ¶ 46.)

On January 22, 2020, Authority's attorney wrote to SBY that Authority recognized SBY's January 15 email as written notice of SBY's intent to terminate the Agreement and that the Agreement would remain in full force through February 14, 2020. (Am. Counterclaim ¶ 47.) Following termination, under Section 3.3 of the Agreement, SBY was responsible for making a Buy Out Payment within 60 days of the termination date. SBY's principal and sole member, Sarah Redfield, said that SBY "fully intend[ed]" on making the buyout payment "in full." (Compl. ¶ 43, Dkt. No. 1.) The underlying complaint filed by Sport of Business against SBY is a breach of contract claim to recover the buyout amount.

In June 2020, while discussions regarding the buyout payment were ongoing, SBY learned from Ullah that in January 2020 Linkenauger told Ullah that they needed to dissolve Authority to avoid a threatened lawsuit from a disgruntled client. SBY also learned that on

5

January 29, 2020, Authority assigned the Agreement to Sport of Business, solely-owned by Linkenauger; that Linkenauger eventually expelled Ullah from Authority; and that on March 11, 2020, Authority filed a Certificate of Cancellation with the Virginia State Corporation Commission. (Am. Counterclaim ¶¶ 53–57.) Ullah also filed a lawsuit against Linkenauger in the Eastern District of Virginia.

In its amended counterclaim, SBY alleges breach of contract claims against Sport of Business (count one) and against Authority and Linkenauger (count two). SBY also asserts claims for fraudulent inducement (count three), unjust enrichment (count four), and overpayment of commissions against Authority and Linkenauger (count five).

## II.  ANALYSIS

### A.  Motion to Dismiss Standard

To survive a motion to dismiss, a pleading must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the plaintiff pleads factual content that allows the court to draw a "reasonable inference that the defendant is liable for the alleged misconduct." *Iqbal*, 556 U.S. at 678. In determining whether SBY has satisfied this plausibility standard, the court must accept as true all well-pleaded facts in the amended counterclaim and "draw[] all reasonable factual inferences from those facts in [SBY's] favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it need not "accept the legal conclusions drawn from the facts" or "accept as true facts or unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

## B. Breach of Contract Claims (Counts One and Two)

Under Virginia law,[2] the elements of an action for breach of contract include (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of that violation, and (3) injury or damage to the plaintiff caused by the breach of contract. *Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004). A contract "must be construed as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions." *Sweely Holdings, LLC v. SunTrust Bank*, 820 S.E.2d 596, 601 (Va. 2018).

SBY alleges a breach of contract claim against Sport of Business in count one, and in the alternative, against Authority and Linkenauger in count two. SBY alleges that Authority breached the Agreement by failing to provide video editing services, failing to edit content for other social media platforms, failing to provide a step-by-step guide on the repurposing strategy, failing to provide access to a comprehensive team of content, editing, advertising, and design personnel, and failing to provide other consulting and marketing services. (Am. Counterclaim ¶ 80.)

SBY cites Section 1.10 of the Agreement, which defines the phrase "Services Provided by the Grantor." Counterclaim-defendants characterize this provision as merely "definitional," not supplying any obligations of performance. Counterclaim-defendants argue that the parties did not contract for Authority Online to provide certain services, and for SBY, in turn, to pay for those services. Instead, the parties executed a license agreement granting SBY the right to use any technical knowledge and expertise provided by Authority. The licensing provision provides:

> Grantor hereby grants to Grantee rights and license of Services Provided by Grantor ("License") in the Territory in exchange for the payment by Grantee to Grantor of any Sales Commission accruing under this Agreement on a monthly basis in arrears. These Sales

---

[2] The parties agree that Virginia law applies. (*See* Agreement § 12 (Governing Law, Venue and Litigation).)

7

> Commission payments shall be made by Grantee out of its Gross Profits. In the event Grantee has no monthly Gross Profits from which it can make the Commission payment, all such payments shall accrue and be paid out of subsequent Gross Profits of Grantee. This License shall provide Grantee with the right to exploit, utilize and commercialize the Services Provided by Grantor in the Territory for the Term as defined herein.

(Agreement § 2.2.)

It may be true that Section 1.10 is in some sense definitional. It is, in fact, under the opening "Definitions" section of the Agreement. This does not preclude the possibility that the language in that section sets forth certain duties of performance under the Agreement. At minimum, the Agreement seems to establish that Authority had a duty under the contract to perform video editing services unless, for whatever reason, SBY deemed there to be "more efficient means." "[The term Services Provided by Grantor] shall also include, *at the request and discretion of the Grantee*, video editing services. If at any time the Grantee deems there are more efficient means to obtain video editing, the Grantor *will not be required to perform this service*." (§ 1.10 (emphasis added).) The phrase "at the request and discretion of the Grantee" would be completely meaningless unless SBY could, in fact, request and be entitled to video editing services. Also, if Authority is *not* required to perform video editing if SBY finds a better video editor, the clear implication is that Authority *is* required to perform video editing in all other circumstances.

The grant of a license under Section 2.2, in and of itself, does not undermine the additional duty to perform the services contemplated in Section 1.10. Indeed, an interpretation where Authority is not required to provide any actual services does not make sense when the court considers Authority's representations that are set forth in the amended counterclaim—that Authority specializes in increasing online video views and repurposing YouTube videos for other

8

social media platforms, and that it would remove the "busy work" and allow SBY to concentrate on creating content. In other words, to the extent there is any ambiguity in the contract regarding the performance of services, SBY's allegations may provide clarity. *See Eure v. Norfolk Shipbuilding & Drydock Corp., Inc.*, 561 S.E.2d 663, 667–68 (Va. 2002) ("When a contract is ambiguous, the Court will look to parol evidence in order to determine the intent of the parties.").

For these reasons, the court will deny the motion to dismiss counts one and two.[3]

### C. Equitable Claims (Counts Four and Five)

In counts four and five, SBY alleges claims for unjust enrichment and overpayment of sales commission against Authority and Linkenauger. SBY pleads these claims in the alternative to her breach of contract claims. Counterclaim-defendants argue that these claims are barred because a party cannot bring equitable claims "in the face of an express contract." *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988). Equitable claims can be pleaded in the alternative to express contract claims. *See, e.g.*, *CMA CGM S.A. v. Cap Barbell, Inc.*, Case No. 2:18-cv-215, 2018 WL 5091627, at *5 (E.D. Va. Sept. 17, 2018) ("Pleading unjust enrichment as an alternative to a breach of contract claim is appropriate where the validity or existence of an express contract governing the plaintiff's claim is in dispute."). If, for example, the court were to find that the Agreement does not cover any of the services that SBY claims Authority Online failed to provide, then the existence of an express contract does not bar SBY's alternative claim for unjust enrichment related to those services.

The court will deny the motion to dismiss counts four and five.

---

[3] Counterclaim-defendants also argue that SBY cannot succeed on her breach of contract claims based on the implied covenant of good faith and fair dealing. The court expresses no opinion on these arguments.

### D. Piercing the Corporate Veil

Counter-defendants move to dismiss SBY's request to pierce the corporate veil of Sport of Business in count one and impose liability on Linkenauger. Piercing the corporate veil is remedy, not a cause of action. *See Job v. Simply Wireless, Inc.*, 160 F. Supp. 3d 891, 901 n.11 (E.D. Va. 2015). A Rule 12(b)(6) motion may be used to dismiss claims, not remedies. *Bocock v. Specialized Youth Servs. of Va., Inc.*, Civil Action No. 5:14cv00050, 2015 WL 1611387, at *2 (W.D. Va. Apr. 10, 2015). In any event, SBY has plausibly alleged that it could be entitled to relief against Linkenauger. *See Vir2us, Inc. v. Sophos Inc.*, Civil Action No. 2:19cv18, 2019 WL 8886440, at *4 (E.D. Va. Aug. 14, 2019) (explaining that Virginia courts require undue dominion and control, the use of such control to perpetrate a fraud or to gain an unfair advantage, and unjust loss or injury from such dominance to pierce the corporate veil); *see also Dana v. 313 Freemason*, 587 S.E.2d 548, 553 (Va. 2003). Thus, the court will not dismiss SBY's requested remedy to pierce the corporate veil.

### III. CONCLUSION

For the reasons stated herein, the court will issue an appropriate order denying the motion to dismiss filed by the counter-defendants.

Entered: March 21, 2022.

/s/ *Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge